# IN THE UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF ARKANSAS
# JONESBORO DIVISION

JOHN EVAN PULLAM                                                                PLAINTIFF

V.                                          3:15CV00085 DPM/JTR

ALLISON HUCKABEE, Jail Administrator,
and ROSEMARY FARMER, Nurse,
Greene County Detention Center                                          DEFENDANTS

## RECOMMENDED DISPOSITION

The following Recommended Disposition ("Recommendation") has been sent to United States District Judge D.P. Marshall Jr.  Any party may file written objections to this Recommendation. Objections must be specific and include the factual or legal basis for disagreeing with the Recommendation. An objection to a factual finding must specifically identify the finding of fact believed to be wrong and describe the evidence that supports that belief.

An original and one copy of the objections must be received in the office of the United States District Clerk within fourteen (14) days of this Recommendation. If no objections are filed, Judge Marshall can adopt this Recommendation without independently reviewing all of the evidence in the record. By not objecting, you may also waive any right to appeal questions of fact.

## I. Introduction

Plaintiff, John Evan Pullam, ("Pullam") has filed this *pro se* § 1983 action alleging that, while he was a pretrial detainee in the Greene County Detention Center ("GCDC"), Defendant Licensed Practical Nurse Rosemary Farmer ("Farmer") failed to provide him with constitutional adequate medical care for seizures, thyroid disease, and mental illness. *Docs. 2 & 6*. He also contends that Jail Administrator Allison Huckabee ("Huckabee") knew about the allegedly inadequate care but failed to take proper corrective action. *Id.* Pullam has brought these claims against Huckabee and Farmer in their official and individual capacities. *Id.*

Farmer and Huckabee have filed a Motion for Summary Judgment, a Brief in Support, a Statement of Facts, and a Reply.[1] *Docs. 29, 30, 31, & 35.* Pullam has filed a Response. *Doc. 33*.

Before reaching the merits of the Motion for Summary Judgment, the Court will review the relevant facts giving rise to Pullam's § 1983 claims:

1. On December 8, 2014, Pullam arrived at the GCDC with a bottle of

---

[1] Summary judgment is appropriate when the record, viewed in a light most favorable to the nonmoving party, demonstrates that there is no genuine dispute as to any material fact, and the moving party is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(a); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322-23 (1986); *Anderson v. Liberty Lobby Inc.,* 477 U.S. 242, 249-50 (1986). The moving party bears the initial burden of demonstrating the absence of a genuine dispute of material fact. *Celotex,* 477 U.S. at 323. Once that has been done, the nonmoving party must present specific facts demonstrating that there is a material dispute for trial. *See* Fed R. Civ. P. 56(c); *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011).

Dilantin, a seizure medication that was prescribed by a private doctor. Pursuant to GCDC policy, Farmer verified the prescription with the pharmacy and submitted it to the GCDC physician for approval. *Doc. 31, Ex. 3*.

2.   On December 10, 2014, Pullam wrote a Request stating: "I need my meds. I have seizures and thyroid problems. I also need to see mental health for a lot of stuff."[2] Farmer responded: "Sending you ear plugs with A.M. med. call. Hope it helps."[3] *Doc. 33 at 20.* The next week, Farmer allegedly told Pullam that she gave him ear plugs to "keep him from hearing voices."[4] *Doc. 2 at 4.*

3.   On December 13, 2014, the GCDC doctor approved the Dilantin prescription, and Farmer began giving Pullam this medication, as prescribed. *Doc. 31, Ex. 3*.

4.   On January 17, 2015, the GCDC doctor also prescribed Gabapentin to treat Pullam's seizures. Farmer properly carried out those instructions. *Doc. 33, Ex.3*.

---

[2] The GCDC grievance procedure requires a prisoner to file a Request. If he is dissatisfied with the response, the prisoner must then file a Grievance. *See Doc. 31, Ex. 1*.

[3] In her sworn affidavit, Farmer explains: "I frequently distribute earplugs to detainees to help them sleep and I made a notation of sending earplugs on the incorrect Request Form here. I did not intend to be disrespectful or unprofessional toward Plaintiff by making this note. It was a mistake." *Doc. 31, Ex. 3 at 4*.

[4] Farmer denies making that statement. *Doc. 31, Ex. 3*. Additionally, it is *undisputed* that Pullam's December 10, 2014 Request did *not allege he was hearing voices,* suicidal, or psychotic. Instead, Pullman only made the vague allegation that he needed "mental health for a lot of stuff." Thus, it seems unlikely that Farmer made the statement imputed to her by Pullam, or that she sent Pullam earplugs to discourage him for seeking mental health care.

5.      On February 28, 2015, Pullam told a jailer that he was having suicidal thoughts.[5] That same day, a social worker from Mid-South Health Systems ("Mid-South") performed a crisis screening on Pullam at the GCDC. The social worker recommended that Pullam either be hospitalized or placed on suicide watch. Because no hospital placement could be found, GCDC jailers put Pullam on suicide watch, where jailers checked him every fifteen minutes. Pullam did not harm himself. *Doc. 31, Ex. 2 at 12-14.*

6.      On March 6, 2015, a Mid-South psychologist examined Pullam at the GCDC; diagnosed him with traumatic stress disorder and anxiety; and determined that he was no longer a suicide risk. At the psychologist's recommendation, GCDC officials removed Pullam from suicide watch later that day. *Doc. 31, Ex. 2 at 15-17.*

7.      On March 21, 2015, Pullam filed a Grievance stating that he wanted a "1983 form" because he was not receiving "proper medical attention" for *unspecified problems*. Huckabee responded to that Grievance as follows: "Brought to nurse's station, talked to [him] in person."[6] *Doc. 33 at 19.*

---

[5] From December 10, 2014 (the date Pullam filed his vague Request seeking "mental health for a lot of stuff") until February 27, 2015, Pullam filed at least eight other Requests seeking a special diet, trustee status, and library access. *Doc. 31, Ex. 2 at 3-11*. *None of those Requests*, including the one Pullam filed the day before he was put on suicide watch, sought mental health treatment or stated that Pullam was having suicidal thoughts.

[6] In her sworn affidavit, Huckabee states that the March 21, 2015 Grievance was the "first and only time" she was aware that Pullam had "any issues with medical care or medication at the GCDC." *Doc. 31, Ex. 1.* In contrast, Pullam alleges that: (1) he sent Huckabee several Requests

8. On March 27, 2015, Pullam was transported to Mid-South, where a social worker diagnosed him with PTSD, depression, social phobia, and unspecified psychosis. The social worker wrote in her treatment notes that she was unable to complete a "master treatment plan" ("MTP") for Pullam because the "jail staff could not transport him to the clinic during the time frame required to complete the MTP." She then recommended that the MTP be completed during a psychiatric exam, which was scheduled for May 6, 2015. Importantly, the social worker did *not* indicate that Pullam needed urgent treatment, evaluation, or medication. A Mid-South doctor later signed and approved the social worker's treatment notes. *Doc. 33 at 14-18.*

9. On April 11, 2015, Pullam filed a Request stating he wanted to see the "Mid-South doctor" because he was "getting worse." Pullam also complained that he had not seen the GCDC doctor "over my thyroid and dizzy spells." An unspecified jail employee responded to that Request as follows: "You are on the list to see the doctor when he comes. Will call Mid-South." [7] *Doc. 31, Ex. 2 at 27.*

10. On April 16, 2015, Pullam was examined by an Advance Practical ("APN") at the GCDC. During that exam, Pullam told the APN that he had last taken

---

seeking unspecified medical care; and (2) on several unspecified occasions, he verbally told Huckabee and Farmer that he needed medical care. *Doc. 33 at 1, 19, & 20*. Importantly, Huckabee was the jail administrator and had no medical training.

[7] The signature on the response is illegible. *Id.*

medication for thyroid disease in October of 2014, which was two months *before* his confinement at the GCDC. *Doc. 31, Ex. 4 at 11*.

11. On April 17, 2015, a GCDC doctor ordered blood work, which demonstrated that Pullam had a *normal* thyroid readings of 3.97, but a low Dilantin level. The doctor then increased Pullam's Dilantin prescription. *Doc. 31, Ex. 4 at 12-16 & 24*.

12. It is unclear whether Pullam received the psychiatric examination that was scheduled for May 6, 2015. However, Pullam *admits* that he began receiving unspecified "mental health medication" on May 27, 2015. *Doc. 33 at 2.*

13. On July 10, 2015, Pullam was transported to a local hospital for treatment of an unrelated condition.[8] A blood analysis showed that Pullam's had an abnormal thyroid level.[9] The doctor diagnosed Pullam with thyroid disease, prescribed medication for that condition, and discharged him to the GCDC.

14. For unknown reasons, Pullam did not begin receiving thyroid medication when he was returned to the GCDC. *Doc. 31, Ex. 6 at 36-43; Doc. 33 at 5 to 12*.

15. On July 14, 2015, Pullam had a seizure, lost consciousness, fell to the

---

[8] Pullam was taken to the hospital in response to his complaints of chest pain. No cardiac abnormalities were detected, and he returned to the GCDC later that day. *Id.*

[9] The normal range for thyroid stimulating hormone ("TSH") is 0.47 to 4.68. On April 17, 2015, Pullam's TSH was 3.97. On July 10, 2015, it was 5.64. *Doc. 31, Ex. 4 at 16; Doc. 33 at 5.*

floor, and hit is head. He was immediately transported to a local hospital, where CT scans and x-rays showed no injuries. Blood taken during that examination revealed that Pullam had a "sub-therapeutic Dilantin level."[10] Pullam was returned to the GCDC later that day, with instructions to take ibuprofen and to "continue Dilantin as scheduled." *Doc. 31, Ex. 4 at 21; Ex. 7 at 5-14.*

16. On August 5, 2015, Pullam was released from custody. Since that time, he has lived at a private residence in Paragould, Arkansas. *Doc. 25; Doc. 31, Ex. 1.*

## II. Discussion

### A. Official Capacity Claims

Pullam's inadequate medical care claims against Huckabee and Farmer, in their official capacities, are actually claims against Greene County. *See Parrish v. Ball*, 594 F.3d 993, 997 (8th Cir. 2010); *Jenkins v. Cnty. of Hennepin, Minn.*, 557 F.3d 628, 631-32 (8th Cir. 2009). Greene County may not be held vicariously liable, in this § 1983 action, for its employees's actions. *Monell v. Dep't. of Soc. Servs.,* 436 U.S. 658 (1978). Instead, it can only be held liable if an official policy, custom, or practice caused Pullam harm. *Jenkins*, 557 F.3d at 632; *Grayson v. Ross*, 454 F.3d 802, 810-11 (8th Cir. 2006). Pullam has not presented *any* evidence to support his claim that Farmer's and Huckabee's alleged misconduct was the result of them following

---

[10] Specifically, Pullam's Dilantin level was 8.7. A normal range is 10 to 20. *Id.*

unconstitutional policies, practices, or customs implemented by the GCDC.

Finally, Pullam's request for injunctive relief is now moot because he is no longer in the GCDC. *See Zajrael v. Harmon*, 677 F.3d 353, 354 (8th Cir. 2012); *Owens v. Isaac,* 487 F.3d 561, 564 (8th Cir. 2007).

Thus, Defendants Farmer and Huckabee are entitled to summary judgment on the § 1983 "official capacity claims" Pullam has asserted against them, and those claims should be dismissed, with prejudice.

**B.     Individual Capacity Claims**

Pullam and Huckabee argue that they are entitled to qualified immunity on the inadequate medical care claims Pullam has raised against them in their individual capacities. Qualified immunity protects government officials from liability for monetary damages in a § 1983 action unless, at the time of the alleged violation, their conduct violated a clearly established federal statutory or constitutional right of which a reasonable person would have known. *Ashcroft v. Al-Kidd*, 563 U.S. 731, 736( 2011); *Saylor v. Nebraska*, 812 F.3d 637, 643 (8th Cir. 2016). To "overcome the defense of qualified immunity," Pullam must show that: (1) the facts, viewed in the light most favorable to him, demonstrate the deprivation of a constitutional right; and

(2) the constitutional right was clearly established at the time of the deprivation.[11] *Saylor,* 812 F.3d at 643; *Livers v. Schneck*, 700 F.3d 340, 350 (8th Cir. 2012).

To demonstrate a violation of his constitutional right to receive adequate medical care, Pullam must establish that: (1) he had objectively serious medical needs; and (2) Huckabee and Farmer subjectively knew of, but deliberately disregarded, those serious needs. *Estelle v. Gamble*, 429 U.S. 97 (1976); *Langford v. Norris,* 614 F.3d 445, 460 (8th Cir. 2010); *Dulany v. Carnahan*, 132 F.3d 1234, 1239 (8th Cir. 1997).

In this case, the parties *agree* that Pullam's mental illness, thyroid disease, and seizures were objectively serious medical needs. Thus, the only remaining issue is whether Huckabee and Farmer were deliberately indifferent to those needs. Deliberate indifference "requires proof of a reckless disregard of the known risk." *Moore v. Duffy*, 255 F.3d 543, 545 (8th Cir. 2001). In other words, to establish a constitutional violation, Pullam must demonstrate that Farmer and Huckabee had "actual knowledge of the risk of harm, followed by deliberate inaction amounting to

---

[11] The Eighth Circuit has recently "rejected attempts by district courts to enter truncated orders that do not provide a thorough determination of the defendants' claim of qualified immunity." *Robbins v. Becker*, 715 F.3d 691, 694 (8th Cir. 2013). In particular, a trial court cannot deny qualified immunity simply because there are material factual disputes. *Id.* Instead, a trial court must determine whether the facts, *viewed in the light most favorable to the plaintiff*, establish a constitutional violation, and if so, whether the constitutional right in question was clearly established at the time of the alleged violation. *Id; Saylor v. Nebraska*, 812 F.3d 637, 643-47 (8th Cir. 2016).

callousness." *Bryan v. Endell*, 141 F.3d 1290, 1291 (8th Cir. 1998). Under this high standard, a mere disagreement over a course of prescribed medical care that involves negligence or even gross negligence does not rise to the level of a constitutional violation. *Langford,* 614 F.3d at 445; *Gibson v. Weber*, 433 F.3d 642, 646 (8th Cir. 2006).

The Court will now determine whether the facts, viewed in the light most favorable to Pullam, establish the Farmer and Huckabee were deliberately indifferent to his constitutional right to receive adequate medical care for seizures, thyroid disease, and mental illness.

  **1. Seizures**

It *is undisputed* that, throughout his eight-month incarceration at the GCDC, Farmer properly and consistently gave Pullam Dilantin and Gabapentin, *as prescribed by a private physician and the GCDC doctor*.[12] Pullam alleges that those medications were not effective and that he had seizures "all the time," while confined at the GCDC. *Doc. 2 at 5.* However, there is nothing in the record to suggest that Farmer or Huckabee had "actual knowledge" that Pullam was having frequent seizures.

---

[12] As previously discussed, the *GCDC doctor*: (1) approved Pullam's freeworld Dilantin prescription on December 13, 2014, which was five days after he arrived at the GCDC on December 5, 2014; (2) added Gabapentin on January 17, 2015; and (3) increased his Dilantin prescription when blood work, taken on April 17, 2015, demonstrated that it was low. There is no evidence that *Farmer* failed to properly carry out those orders or that she had the authority to change them.

*Bryan*, 141 F.3d at 1291. To the contrary, although Pullam filed at least 39 Requests while at the GCDC, *none of those Requests stated that he was having seizures.*[13]

Similarly, Pullam alleges that his Dilantin medication was not properly increased after he had a seizure on July 14, 2015. However, none of Pullam's treating physicians determined that it was necessary to do so. As non-physicians, neither Farmer nor Huckabee had the authority to overrule the medical decisions made by Pullam's treating physicians.[14] Finally, *the doctors'* alleged failure to increase Pullam's seizure medications, prior to his release from custody on August 5, 2015, would *at most be negligence*, which is not a basis for recovery in a § 1983 action. *See Hines v. Anderson;* 547 F.3d 915, 920-21(8th Cir. 2008) (holding that unspecified delays in refilling the prisoners' various prescriptions did not rise to the level of constitutional violation); *Ervin v. Busby*, 992 F.2d 147, 150-51 (8th Cir. 1993) (finding that a thirty-day delay in refilling a pretrial detainee's antidepressant prescription was not a constitutional violation).

---

[13] On July 14, 2015, GCDC officials took Pullam to the hospital immediately after he had his *only documented seizure*. Thus, there is no evidence in the record to support Pullam's allegation that he was having seizures "all the time." Nevertheless, even if the Court accepts the truth of that allegation, there is simply no evidence that either Farmer or Huckabee were subjectively aware that Pullam was allegedly having seizures while in the GCDC.

[14] Farmer is a licenses practical nurse, while Huckabee is the jail administrator and had no medical training. *See Drake ex rel Cotton v. Koss*, 445 F.3d 1038, 1042-43 (8th Cir. 2006) (explaining that prison supervisors, who lack medical expertise, cannot be held liable for treatment decisions made by medically trained prison staff); *Meloy v. Bachmeier*, 302 F.3d 845, 849 (8th Cir. 2002) (same).

Because Pullam does not have evidence that Farmer and Huckabee violated his constitutional right to receive adequate medical care for his seizure disorder, they are entitled to qualified immunity, and this claim should be dismissed, with prejudice.[15] *See Saylor v. Nebraska,* 812 F.3d 637 (8th Cir. 2016) (granting qualified immunity when a prisoner did not have evidence supporting his claim that prison officials violated his constitutional right to receive adequate medical care).

### 2. Thyroid Disease

It is undisputed that Pullam did not receive any thyroid medication while at the GCDC. However, Pullam admitted that he stopped taking the thyroid medication in October of 2014, *two months before he arrived at the GCDC.* It is also undisputed that, on April 17, 2015, Pullam's thyroid level was *within the normal range.* Thereafter, Pullam did not file any Requests seeking treatment for thyroid disease. Instead, Pullam's elevated thyroid level was inadvertently discovered, on July 10, 2015, when he was taken to the hospital for treatment of an *unrelated condition.*

Pullam was released from the GCDC twenty-six days later, on August 5, 2015. He has not presented *any evidence* demonstrating that he received thyroid medication after he was released from custody or that he was harmed, in any way, by not

---

[15] Because there is *no evidence of a constitutional violation*, there is no need for the Court to address the second step of the qualified immunity analysis, *i.e.*, whether Pullam's constitutional right to receive adequate medical care for seizures was clearly established when he was confined in the GCDC from December of 2014 to August of 2015. *See Saylor*, 812 F.3d at 645-47.

receiving thyroid medication during the final twenty-six days he was incarcerated at the GCDC. *See Jackson v. Riebold*, 815 F.3d 1114, 1119-20 (8th Cir. 2016) (to avoid summary judgment, an inmate alleging a constitutionally actionable delay in medical treatment must place verifying medical evidence in the record to establish the detrimental effect of the alleged delay); *Gibson v. Weber*, 433 F.3d 642, 646-47 (8th Cir. 2006) (same). Finally, there is *no evidence* suggesting that Farmer and Huckabee had any role or involvement in Pullam not receiving any necessary thyroid medications during his last twenty-six days in the GCDC.

Because Pullam does not have any evidence demonstrating that Farmer and Huckabee violated his constitutional right to receive adequate medical care for thyroid disease, they are entitled to qualified immunity and this claim should be dismissed, with prejudice.

### 3. Mental Illness

Pullam claims that Farmer acted with deliberate indifference when she responded to his December 10, 2014 Request by giving him ear plugs.[16] However, in that Request, Pullam vaguely stated that he wanted "mental health for a lot of stuff." Pullam did *not* declare that he was suicidal or otherwise alert Farmer that he was in

---

[16] As previously discussed, at the summary judgment stage, the Court must accept Pullam's allegation that Farmer did so intentionally.

urgent need of mental health care. Similarly, Pullam did *not* renew his request for mental health care in any of eight Request forms he filed during the next two months. For instance, on February 27, 2015 (which was the day before he expressed suicidal thoughts), Pullam filed a Request seeking permission to become a trustee, but made no mention of being depressed, suicidal, or otherwise needing mental health treatment. *Doc. 31, Ex. 2 at 11.* Thus, there is no evidence that Farmer was subjectively aware that Pullam was in urgent need of mental health treatment.

It is also undisputed that, when Pullam finally expressed suicidal thoughts, on February 28, 2015, GCDC officials: (1) immediately had him evaluated by a social worker; (2) followed the social worker's recommendation that he be placed on suicide watch; and (3) *successfully prevented Pullam from harming himself.*

Pullam also argues that, on March 27, 2015, the Mid-South social worker could not complete his evaluation because the "jail staff could not transport him to the clinic during the time frame required to complete the MTP." *Doc. 33 at 16.* However, there is *no evidence* that Farmer and Huckabee were involved in scheduling or transporting Pullam to this appointment. More importantly, the Mid-South social worker and physician *did not recommend* that Pullam receive immediate mental health care or start psychiatric medications. Instead, they recommended that Pullam return to Mid-South on May 6, 2015, for completion of his master treatment plan. Pullam

*admits* that he began receiving psychiatric medications on May 27, 2015. There is no evidence that Pullam was harmed by any delay associated with him receiving that medication. *See Jackson*, 815 F.3d at 1119-20; *Gibson*, 433 F.3d at 646-47.

Because Pullam does not have any evidence that Farmer and Huckabee violated his constitutional right to adequate mental health care, they are entitled to qualified immunity and that claim should be dismissed, with prejudice.

### III. Conclusion

IT IS THEREFORE RECOMMENDED THAT Defendants' Motion for Summary Judgment *(Doc. 29)* be GRANTED, and that this case be DISMISSED, WITH PREJUDICE.

Dated this 27th day of June, 2016.

_____
UNITED STATES MAGISTRATE JUDGE